IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 19, 2025 Session

## TRAVIS LYNN RASMUSSEN v. SASHA NICOLE RASMUSSEN

**Appeal from the General Sessions Court for McNairy County**
No. 22-DV-44      Van McMahan, Judge
_____

**No. W2025-00171-COA-R3-CV**
_____

This is an appeal from a final decree of divorce. The trial court found that the husband is a business owner and that his business, known as Choice Pool Care, LLC, constituted a marital asset. It then awarded the wife "a 20% share of the business." However, the trial court did not value the marital asset. The husband appeals, insisting that the trial court erred in finding the existence of a marital asset and in its equitable division of the asset. For the following reasons, we affirm the trial court's classification of the husband's ownership interest in the LLC as marital property, but we vacate the trial court's ruling regarding equitable division of the asset and remand for the trial court to value the asset prior to equitably dividing the marital estate. The trial court's rulings regarding child support and alimony are likewise vacated and remanded for reconsideration in light of the further proceedings that are necessary as to the division of the marital estate.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed in Part, Vacated in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Sara E. Barnett and Charles H. Barnett, IV, Jackson, Tennessee, for the appellant, Travis Lynn Rasmussen.

Sasha Nicole Rasmussen, Michie, Tennessee, pro se.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Travis Rasmussen ("Husband") and Sasha Rasmussen ("Wife") married in 2013 in Arizona, when they were in their early twenties. They now have five children. While living in Arizona, Wife worked as a real estate agent, and Husband owned a pool service company called Choice Pool Care, LLC. In January 2020, the family moved to McNairy County, Tennessee. Wife was a stay-at-home mother thereafter.

Husband, who has an associate's degree, began working in sales of "merchant services," selling credit card processing services and the necessary machines to businesses. According to Husband, he essentially goes out into communities and talks to business owners to discuss with them whether he can offer a better credit card processing system than whatever they currently use. They discuss options, he fills out an application for a merchant account and submits it to his main office, and then the main office sends out the necessary equipment. However, Husband is not considered an employee of the "main office" company that actually sends out the equipment and handles the credit card processing services, which is called "Payroc." Payroc considers the work as being done by an independent contractor.

Whenever Husband closes a new deal or account, he receives an "upfront" bonus, and thereafter, on a monthly basis, he receives a percentage of the client's "volume that they run and all of the credit card fees that they charge," so long as the account continues in existence. The percentage received can vary widely depending on many factors, but it generally ranges between one-tenth of one percent and one percent of the fee charged for the credit card purchase. So, if Husband signs up a particular business that conducts a lot of sales, he stands to make a lot of income from that account, which he admits is "somewhat passive." Husband eventually established 250 accounts across five states. Husband estimates that, on a typical workday, he handles issues that arise with three to five accounts, such as troubleshooting equipment issues, handling account questions, etc. He receives a check at the end of each month with all of the "residual" commission income based on the percentages for his accounts. Husband elected to have Payroc "route" the money through his existing LLC, Choice Pool Care, in order to take advantage of business tax deductions. Thus, Payroc issued 1099s to Choice Pool Care, LLC reflecting the income earned each year. Husband filed both personal and business tax returns each year, which showed business income for Choice Pool Care, LLC. In 2022, the tax returns showed business income of over $170,000.

Husband filed a complaint for divorce in 2022. Wife filed an answer and countercomplaint for divorce. The divorce trial was held over the course of two days in March and April 2024. By that time, the parties had been married for eleven years. At trial, Wife took the position that Choice Pool Care, LLC was a business and a marital asset subject to equitable division. Husband, on the other hand, insisted that no business existed and that he simply worked a "sales job." Thus, Wife's proposed division of marital property listed the business as an asset to be valued and divided, while Husband listed no asset whatsoever related to his work.

Husband was the first to testify. He was 34 years old and had an associate's degree. He testified that he had been in the "[s]ales" profession for five years. Specifically, he described his work as "fully commissioned sales." He explained how he "knock[s] on doors" and talks to businessowners about selling them merchant services, which consists of the service and the equipment. Husband described the "upfront" bonuses he receives for signing up accounts, as well as the "residual" income he receives monthly, based on the percentages from transactions "for the remainder of that account." He explained that a change in the number of accounts he has "does not equal income necessarily" because it depends on the volume of each store. Husband agreed this residual income is "somewhat passive" but said that he is required to "service" his clients when they call him about issues. He estimated that he has three to five clients each day who "call [him] with issues," such as a machine being down or unable to print, or a question about a fee, updating a bank account, or transferring their service to a new business. Husband testified that his response "depends on the issue." He said "[a] lot of the times" he can handle it over the phone, other times he has to go to the business and see if he can fix the issue in person, and sometimes he refers matters to the main office because "they can do things that I can't." Husband testified that he last signed up a new account about a week ago, but he admitted that if he decided not to sign up any new accounts in the next month, he would still make money. He also admitted that there was a period during the divorce proceeding when he "didn't go to work," and yet he still received the residual income. Husband acknowledged that he will continue receiving the residual income as long as a client does not change who it uses as a credit card processor, so basically all he has to do is take the service calls to service the accounts. He claimed, however, that "if you don't service those accounts they will leave fairly quickly." Husband testified that he had no employees but admitted that he could "theoretically" hire someone to service the accounts or sign up new ones, noting that other people in his line of work had built up large businesses with employees. Husband claimed that Wife did not know how to do the work and played no part in it.

Husband testified regarding his business and personal tax returns. When asked if his business tax return indicates that "you have a business and business income," he replied, "Correct." His tax returns for 2022 reflected business income of $170,788, which equated to $14,231.50 in income per month. Husband testified that when he began this type of work, others advised him that it would "be smart for tax purposes to have it routed through an LLC." He testified that whenever he received tax documents from Payroc, such as 1099s, they were "made out to" Choice Pool Care, LLC rather than him individually. Thus, Husband conceded that Payroc was indicating to the federal government that it was paying "[his] business." However, he testified that the money was direct deposited into his personal bank account. He received a Schedule K-1 reflecting his share of the ordinary business income for Choice Pool Care, LLC, which also stated that he owned one hundred percent of the shares of the company. Husband's returns reflected that he had depreciated "equipment" of Choice Pool Care in the sum of $11,899. When asked about this at trial, however, Husband insisted he "ha[d] no idea" what that reflected because he just relied on

- 3 -

"what the tax guy tells me." He acknowledged that his returns showed that he deducted automobile expenses of $26,217. He admitted he also deducted expenses for meals, office expenses, telephone expenses, travel, bank charges, dues and subscriptions, insurance, legal and professional expenses, postage, and utilities. When asked why he would be deducting utilities if he does not have a business, Husband insisted, "I don't know what those charges are." He did acknowledge, however, that he had taken "various business expenses" as deductions. He also filed a franchise and excise tax return with the Tennessee Department of Revenue. He was asked, "now in Tennessee, are you aware that unless you are a business, you as an individual, you never would pay franchise and excise tax because we do not have -- in Tennessee, do you know we don't have a state income tax? Do you know that?" He responded, "I do." After reviewing all of this documentation, Husband testified that he maintained his position that "this is not a business," even though he had filed business tax returns, wrote off business expenses, and received 1099s issued to the LLC. He testified that he had no business facilities, business equipment, business phone line, or business address. He was asked "if you're not a business, how in the world do you have these expenses?" Husband replied, "I mean, I do have an LLC."

Husband testified that he had recently accepted a "buyout" from Payroc, as the company occasionally offered to pay a lump sum upfront to buy a percentage of his residual income. On this occasion, he had received $87,500. He sold one-third of his residual income or "book of business."[1] He explained that he "own[s] the residual income" and that the company essentially bought a percentage of it. Husband said that this was an "internal deal" and that he did not think that he could sell accounts to someone else, adding, "I don't know that selling them externally is a thing." However, he admitted that he did not have any proof that he *couldn't* sell the accounts. Husband acknowledged that his income, in general, was going up each year, as his returns showed net receipts of $145,000 in 2020; $172,420 in 2021; and $225,000 in 2022 with the "payout." Wife's counsel asked Husband if Wife would have more money post-divorce "if the Court awards your wife her equitable share of your business and/or orders that it can [be] a payout over years from the business." Husband responded, "Theoretically. I don't know if that's even possible." When asked if the court could "order you to pay a distributive amount of that each month or yearly to your wife," Husband replied, "I don't know the Court's capabilities."

Wife also testified. She had a GED and was working as a substitute teacher and on weekends at a women's recovery center. She testified that Husband had cut her off from marital funds for a period and that she had been living in a camper because she had no where else to go.[2] She was currently staying with a friend. Wife noted that one "glaring

___

[1] On the first day of trial, Husband said the buyout was for $87,500. On the second day of trial, he testified about selling a portion of his accounts for $75,000. It is not clear from the record which is the correct figure, but we note that on the first day of trial, Husband was being questioned about numbers on his tax documents when he identified $87,500 as "other income" he received for the buyout. Husband's brief on appeal also refers to "a one-time $87,500 cash out of residual commissions."

[2] Weeks after the complaint for divorce was filed, Husband filed a motion for exclusive possession

difference" between her proposed marital property division and Husband's was that she listed "the business" on her proposal and included a proposed valuation. Wife's attorney asked her to explain "[h]ow did we do that." Wife testified that they had taken an average of the last three years of income or profit according to the business's tax returns, then multiplied that by ten to show the business's revenue over the next ten years. Her proposed valuation was $1,808,400. Wife's proposed marital property division listed this as the "Book of Business/Account Receivable, Choice Pool Care, LLC," and she proposed awarding each party half of the asset's value -- $904,200. Her proposal stated that the value was "gathered by averaging what earnings will be over 10 years." Wife testified that she believed her valuation method was fair because it assumed no growth or new accounts and no inflation, and it was $1.8 million "[j]ust in residual income." She testified that she did not have any type of "business evaluation expert," although she "would have liked to," because she had been cut off from the family's finances and did not have the ability to pay for it. Wife testified that she had not received any of the business's income since the parties separated because Husband diverted the funds from the business into a bank account he controlled.

Wife strongly disagreed with Husband's position that this was not a business. She pointed out that he had sworn under penalty of perjury on his federal tax returns that it was a business and wrote off over $40,000 in business expenses. She testified that the business had always written off business expenses and that they would not have done so if it was not a business. She claimed that Choice Pool Care, LLC was now a credit card merchant business. Wife said, "He doesn't have a job. We own a business together."

Wife also testified that Husband does not have to "service" his accounts. She insisted that the clients "don't get serviced at all." She clarified that when they are "serviced," "it's just courtesy." Thus, according to Wife, the clients do not get serviced on a weekly, monthly, or even yearly basis, and "[t]here are clients that don't ever hear from us after their first time signing up." She said, "Most of them are not serviced at all ever." According to Wife, "[t]hese clients do not require ongoing service of any kind." Simply put, she explained, "Our business does not service clients . . . . The clients don't require service." Wife also testified that the clients could be "serviced," to the extent necessary, through a different avenue. She testified that Husband's voicemail recording on his phone redirects merchants to call a corporate number anyway. Thus, Wife insisted that Husband

---

of the marital residence and exclusive custody of the children due to a recent suicide attempt by Wife. The trial court entered an ex parte order granting the motion pending further orders of the court. This order was later extended as to exclusive use of the residence, although Wife was granted visits supervised by her mother. Wife filed a motion for pendente lite alimony, noting that she was a homemaker without any income and was forced to live in a tent as a result of the trial court's orders. Around this time, Wife's counsel withdrew. Wife later obtained new counsel and filed another motion for temporary spousal support, which was finally granted in November 2023. However, it appears that she resided in a camper parked at the marital residence for much of the divorce proceeding. Temporary custody of the children was returned to Wife during the proceeding due in large part to Husband being arrested for DUI.

continues to get paid "whether he goes to work or not." She testified that Husband only worked a couple of months the previous year and made over $200,000. Wife also testified that if Husband died, the business would continue in existence. She added, "It would be transferred to me in totality, and I would just continue to receive all of the income from the business." She testified that the accounts would still exist and that they would be transferred to her.

In conclusion, Wife proposed that she receive either a buyout of her ten-year valuation of $1.8 million or some sort of yearly payment with regard to the business. She testified that she preferred a lump sum buyout so that she could use it to pay off the mortgage on the marital home in the event the trial court awarded it to her along with custody of the children.

Husband was called as a rebuttal witness. He testified that it was not true that he did not service clients and said "for her to pretend that she knows the first thing about what I do for my job is laughable." Husband insisted that clients "definitely require regular servicing" and that "every day there's a client that I have to attend to" either by phone or in person. As an example, he said that he sometimes has to order replacement equipment from the main office, and when it arrives he will go out and reinstall it for the customer. Husband said he also looks up accounts to resolve billing issues. He admitted, however, that most of his customers "don't cancel" and "[d]on't ever leave" once they sign up. He estimated that he had about fifteen percent turnover per year but clarified that he is usually able to sign up enough new accounts to cover that fifteen percent turnover. In conclusion, Husband said, "I'm always doing stuff for the business whether it's from home over the phone or out in the field."

The trial court entered a final decree of divorce in July 2024. Pertinent to this appeal, the trial court found:

> The Husband has argued his income from the credit card service and sales is an employment situation or wages rather than his own business income. However, the evidence is clear he is not an employee of any company or business but rather he is a business owner. The Husband receives a 1099 and not a W2 for his business income. Moreover, his tax documents show his income goes into a L.L.C., called Choice Pool Care, L.L.C., The court finds the business to be a marital asset.
>
> The Wife contributed to the business's growth by being a stay-at-home mom for the children. Therefore, she is entitled to an equitable share of this asset. The Parties did not hire any kind of expert to determine the value of the business. The Husband testified and tax documents prove that he made $170,788.00 in tax year 2022, $137,374.00 in 2021, and $145,017.00 in 2020, for a yearly average of $151,059.67. This comes to $12,588.31 per month gross income over the last three years. The Wife

argues the business' value is $1,808,400.00. The Wife testified she simply took an average of the business income over a 10-year period. The court recognizes this doesn't account for many factors one normally would consider in evaluating a business's value, including but not limited to the cost of doing business and other expenses.

In considering both Parties' proposed distribution of assets, financial affidavits, and other facts of this case, the court has determined that it is equitable to award Wife a 20% share of the business known as Choice Pool Care, L.L.C., and any other business owned by Husband now or in the future involving the sale of credit card machines and services, including the residual sales earned by Husband mentioned and detailed above.

Wife was designated primary residential parent, and Husband was ordered to pay child support. Husband was also ordered to pay Wife transitional alimony in the sum of $1,500 per month for three years.

Wife filed a motion to alter or amend, seeking clarification of the trial court's rulings on various issues. Regarding the marital property division, she noted that the trial court awarded her twenty percent of the business, but she sought "clarification as to the value of the business and what date [Husband] is to pay her the twenty percent (20%) awarded to her and going forward." Husband also filed a motion to alter or amend seeking clarification of the trial court's order. He also noted that "the Court awarded [Wife] twenty percent (20%) of [Husband's] credit card business." Husband noted that "[i]f [he] gives [Wife] twenty percent (20%) of his book of business," his income going forward will be less, so different figures should be utilized for calculating the parties' incomes for purposes of alimony. Husband then filed an amended motion, in which he stated, "In regard to Husband's business, is the 20% awarded to Wife of the residuals and can Husband, if he is able to, simply transfer 20% of the residuals to Wife?" He further stated in a memorandum of law:

In the instant case, the court awarded Wife twenty percent (20%) of Husband's credit card processing business. The only asset of the business is the residual income that comes from credit card processing. Husband can easily ascertain the value of the business on the day of divorce by contacting his company and finding out the exact dollar amount due to him on the day or month of divorce. Furthermore, Husband can instruct the company to assign to Wife twenty percent (20%) of that total income moving forward. Therefore, if Husband's total residual income for the month was $12,000.00 at the time of the final divorce hearing, Wife would receive $2,400.00 or twenty percent (20%) of that income.

Wife also filed a memorandum, suggesting that the trial court had intended to award her "a 20% interest not only in the current residual sales but in the broader value of the business,

- 7 -

including future income and growth potential." She also argued that Husband should not, at that point in the proceedings, be permitted to introduce new arguments regarding the valuation of the business when he failed to do so during trial. She noted Husband's previous position that there was no business and therefore no value. Wife pointed out that she was the only party to present valuation evidence at trial, so she asked the court to either adopt her proposed valuation or maintain its award to her of twenty percent of the business, which, she suggested, would permit an approach whereby she could "simply receive 20% of the business's monthly income."

At the hearing on the motion to alter or amend, when the parties asked for clarification regarding the award of twenty percent of the business, the trial judge responded, "I can't give you an amount because I don't know. I don't know. There was hardly any testimony concerning the business value. That's why I just said 20 percent." Wife's counsel again noted that she was the only party to present valuation evidence at trial and suggested that the court could adopt her value. Ultimately, however, counsel reiterated that Wife was awarded twenty percent of the business and said, "We just need clarification as to what the Court means by that and how to accomplish that." Husband's counsel asked, "[I]f my client can assign 20 percent of the residual accounts and just give them to wife, like carve out that 20 percent just like he would sell it back to the company and give that to wife, would that accomplish what you wanted to accomplish?" Wife's counsel objected to this proposal to the extent that it could permit Husband to select more valuable accounts for him to retain while Wife received accounts with a smaller volume of business. When the trial judge asked for more detail about Husband's proposal, the following exchange occurred:

> THE COURT: How would you propose to do that on the residuals?
> MR. CASEY [Husband's trial counsel]: I would propose that -- he has residual accounts that he does not have to work for, that the money just comes.
> THE COURT: Right.
> MR. CASEY: So he would take 20 percent of those at the day of divorce or the day of final decree and give those to wife so she would have 20 percent of that business at that time, and she would receive all income from that 20 percent moving forward.

Wife's counsel again expressed concerns with Husband selecting less profitable accounts for her to receive, and he suggested that the court could instead award her twenty percent of the net profit of the business. Husband's counsel responded, "he has told me he wouldn't be choosing accounts, it would just be 20 percent of the accounts period." Thus, the parties discussed whether Wife could receive "20 percent of the residuals from all the accounts," meaning "20 percent from every account that existed at the time of the divorce." In other words, Wife would receive twenty percent from account A, twenty percent from account B, and so on. Wife's counsel said "we possibly could do that" but questioned whether they

could identify "what accounts existed at the time." Husband's counsel reiterated his position that the property has to be "divided at the day of divorce." The trial judge stated, "Doesn't have to be. That's what you're wanting it to be, but it doesn't have to be that way." The judge explained, "If the parties own a business together, then if I gave wife 20 percent of that business and that business is an ongoing business, then she's entitled to that 20 percent of what the business existed." The judge explained that "the business is an asset – it is a marital asset. Now – but if y'all want to agree to do it a different way, that's fine." Wife's counsel stated that she agreed with his award of twenty percent of the business. The trial judge replied, however, "But the problem is going to be, because there's no amount, if you go by just net income at the end of the year, 20 percent of the net of the business was what it would be worth, you might not have as much as you're getting proposing right now. It might be less because the expenses might be more, . . . the business may not make anything. It might show a loss." Husband's counsel questioned how the court could "award her his future." The judge explained that "this is not an employment situation, this is an asset." Husband's counsel argued that the award was "more of a form of alimony than a property division." The trial judge stated that he would take the matter under advisement and consider memoranda submitted by the parties on the issue.

The trial court entered an order resolving the parties' motions to alter or amend in January 2025. The trial court amended various provisions of the divorce decree regarding parenting matters, alimony, and miscellaneous issues. However, the order stated that "[a]ll other issues raised in the pending Motions are hereby denied." Husband subsequently retained new counsel and filed a notice of appeal.

## II. ISSUES PRESENTED

Husband presents the following issues for review on appeal:

1. Whether the trial court erred as a matter of law by classifying Appellant's personal earning capacity from commissioned sales work as divisible marital property and awarding Appellee twenty percent of all future commission earnings in perpetuity, where the undisputed evidence established that: (a) the purported "business" consists solely of Appellant's individual sales efforts with no transferable assets, goodwill, or independent value; (b) the LLC structure serves only as a tax reporting convenience; and (c) the award violates Tennessee's prohibition against dividing professional goodwill and future earning capacity.

2. Whether the trial court erred by simultaneously characterizing Appellant's commission income as both divisible marital property awarded to Appellee and as available income for calculating Appellant's child support and alimony obligations, thereby violating Tennessee Code Annotated § 36-4-121(b)(1)(E)'s prohibition against double-counting distributed assets and

creating mathematically impossible support obligations that exceed Appellant's actual available income.

Wife, who is proceeding pro se on appeal, presents the following issues for review:

1.      Whether the trial court properly classified residual income from the parties' jointly created business as divisible marital property, and whether Appellant's attempt to characterize an existing asset with a substantial ascertainable value as personal earning capacity—after trial testimony and judicial findings established otherwise—invokes the doctrine of unclean hands, wherein:

(a) The trial record and Appellant's own attorney acknowledged that residuals from the parties' client accounts were passive and required no active servicing, and the income at issue was clearly defined as a vested interest in the value of those accounts, not personal labor.

(b) Appellant's conduct throughout the proceedings squarely invokes the equitable doctrine of unclean hands. At the outset of the divorce, he unilaterally opened a new bank account in his name only, diverted all marital assets to that account without court approval, and removed Appellee from all credit cards. In doing so, he maintained sole control over more than $500,000.00 in passively generated marital funds during the pendency of the divorce. This allowed Appellant to retain full access to counsel and the legal system, while Appellee, deprived of any resources, was forced to proceed without comparable representation. . . . .

(c) Rather than participate in valuing the jointly created business, Appellant denied that a business even existed, at times suggesting that federal tax returns should be disregarded or treated as fraudulent. He offered no valuation at trial. Accordingly, the only valuation in the record is Appellee's, supported by ample evidence. Where an existing asset of substantial and readily ascertainable value was clearly established, Appellant's attempt to reclassify that asset as "future earnings" or personal goodwill—while simultaneously denying discovery and disobeying orders—underscores precisely why the doctrine of unclean hands bars him from relief.

(d) The trial court's language referencing "any LLC or other business related to credit card processing" was not an imposition of future servitude but a necessary measure in response to Appellant's bad faith conduct, including alluding to circumvention of orders by asserting ownership through other entities, refusing compliance, and failing to ensure wage assignments were honored by Payroc.

2.      Whether Appellant's claim of impermissible double-counting is moot where Appellee expressly waives any present or future claim to child support or alimony and instead seeks complete financial disentanglement, including

- 10 -

the right to provide full support for the children without reliance on Appellant.

(a) Appellant has never reimbursed even a single uncovered cost—whether medical, therapy, dental, school-related, or extracurricular—despite a court order assigning him a pro rata share of such expenses and Appellee requesting 50% reimbursement. His complete failure to contribute since the close of trial has resulted in service interruptions and hardship for the children, including reliance on Tennessee's Safety Net program due to unpaid amounts and the $18,400 deductible on the insurance plan he obtained.

(b) Support orders have been routinely used coercively, with Appellant conditioning payments on unrelated demands and refusing to pay without control, thus validating Appellee's position that continued financial entanglement serves no one's best interest.

(c) Appellee now explicitly waives any entitlement to support and seeks only her equitable share of the business as of the date of divorce, not future earnings.[3]

For the following reasons, we affirm the classification of Husband's ownership interest in the LLC as a marital asset but vacate the trial court's ruling regarding equitable division of the asset and remand for the trial court to value the asset prior to equitably dividing the marital estate. The court's rulings regarding child support and alimony are likewise vacated and remanded for reconsideration in light of the further proceedings that are necessary as to the division of the marital estate.

## III. DISCUSSION

### A. Classification as a Marital Asset

The first issue raised on appeal by Husband is whether the trial court erred by "classifying [his] personal earning capacity from commissioned sales work as divisible marital property."

"The process for disposition of marital property in a divorce is (1) identification of the parties' property, (2) classification of the parties' property as marital or separate property, (3) valuation of the property, (4) distribution of the property[.]" *Trezevant v. Trezevant*, 568 S.W.3d 595, 606 (Tenn. Ct. App. 2018). Thus, the court must begin by identifying the property and classifying it as marital or separate. "The classification of particular property as either separate or marital is a question of fact to be determined in

---

[3] Husband acknowledges Wife's issue regarding waiver in his reply brief but concedes that she "cannot unilaterally modify a final judgment through appellate representations, and child support belongs to the children and cannot be waived by parents."

- 11 -

light of all relevant circumstances." *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 245 (Tenn. 2009). "As such, we employ the familiar standard of review outlined in Rule 13(d) of the Tennessee Rules of Appellate Procedure." *Barton v. Barton*, No. E2019-01136-COA-R3-CV, 2020 WL 6580562, at *3 (Tenn. Ct. App. Nov. 10, 2020) (citing *Bewick v. Bewick*, No. M2015-02009-COA-R3-CV, 2017 WL 568544, at *7 (Tenn. Ct. App. Feb. 13, 2017)). "Marital property" is defined in part as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce[.]" Tenn. Code Ann. § 36-4-121(b)(2)(A).

Here, the trial court found that Husband sells credit card processing services and has around 250 accounts, for which he is paid a residual sales commission based on a percentage of credit card charges. The court found that Husband does not receive a W2 from the company. The trial court noted Husband's position that his income is from a mere "employment situation or wages rather than his own business income." It flatly rejected that argument. The court found the evidence was clear that Husband was "not an employee of any company or business but rather he is a business owner." The court found that the "business income" was reflected on a 1099 and that his tax documents showed that the income went into his LLC called Choice Pool Care. The court found "the business to be a marital asset." The court found that Wife was entitled to "an equitable share of this asset" and awarded her "a 20% share of the business known as Choice Pool Care, L.L.C., and any other business owned by Husband now or in the future involving the sale of credit card machines and services, including the residual sales earned by Husband mentioned and detailed above." Thus, the trial court's order classified the parties' business or LLC as a marital asset subject to equitable division.

"Under Tennessee law, a *membership interest in* a limited liability company is a type of personal property." *Barton*, 2020 WL 6580562, at *3 (citing Tenn. Code Ann. § 48-249-502(a)) (emphasis added). This principle is well-illustrated in *Barton*, which was also a divorce case. The husband owned a "100 percent ownership interest" in an LLC called Vanquish Worldwide. *Id.* The trial court's divorce decree stated that "*Vanquish Worldwide, LLC is a marital asset* and the Wife has an interest in Vanquish Worldwide, LLC as a marital asset." *Id.* (emphasis added in *Barton*). On appeal, the husband argued that the trial court erred in classifying the business entity, Vanquish Worldwide, as a marital asset. *Id.* at *2. At the outset, we explained that "[b]ecause Husband's interest in Vanquish Worldwide was acquired during the marriage, it is presumed to be marital property." *Id.* at *3. The husband did not attempt to argue that his interest in the LLC was separate property, and in fact he conceded that his "membership in Vanquish Worldwide, LLC may be a marital asset, subject to valuation and division as a marital asset." *Id.* He took issue with the italicized language above, in the divorce decree, stating that the LLC itself was a marital asset. *Id.* We recognized that the language utilized in the divorce decree regarding Vanquish Worldwide was "somewhat inconsistent," as the asset was discussed under the heading "Business Interests," but in the section of the order cited by

- 12 -

the husband, "the trial court stated that the LLC is a marital asset, rather than stating that Husband's 100 percent ownership of the LLC is a marital asset." *Id.* "Notwithstanding this imprecision in language," we found it was "clear that the trial court's intent was to classify Husband's interest in Vanquish Worldwide as marital property, which it awarded to Husband." *Id.* Therefore, we affirmed "the trial court's classification of Husband's ownership interest in Vanquish Worldwide as a marital asset." *Id.*[4]

We reach the same conclusions here. It is undisputed that Husband acquired his interest in Choice Pool Care, LLC during the marriage. Therefore, it is presumed to be marital property. *See id.* Husband does not argue that his interest in the LLC would constitute separate property. In fact, during oral argument before this Court, a member of the panel asked Husband's counsel if Husband's ownership interest in the LLC was a marital asset. He responded, "[i]t may be," although he said he was not clear as to whether the trial court found that. When asked again later in the argument if the ownership interest in the LLC would constitute marital property, Husband's counsel replied, "The membership interest in Choice Pool Care, yes, could be a marital asset."[5] He suggested it "just doesn't have any value." We conclude that Husband's ownership interest in Choice Pool Care, LLC is a marital asset. Although the trial court used some imprecise language, as in *Barton*, referring to the business as a marital asset, we find it "clear that the trial court's intent was to classify Husband's interest in [the LLC] as marital property." *See id.* We therefore affirm the classification of Husband's ownership interest in Choice Pool Care, LLC as a marital asset.

## B.    *Valuation & Distribution of the Asset*

The next part of Husband's first issue on appeal is whether the trial court erred in "awarding [Wife] twenty percent of all future commission earnings in perpetuity." He claims that the trial court "divided [his] future income, as a marital asset" and awarded Wife "ongoing percentage payments" of "twenty percent of all future earnings in perpetuity." However, we do not interpret the trial court's order as accomplishing that result. To be sure, the attorneys and the trial judge discussed various proposals for dividing the accounts and/or the monthly income during the hearing on the motion to alter or amend, when discussing how the trial court's order should be interpreted and what the court intended. However, the trial court denied the motion without any amendment to its original ruling. The divorce decree, as it stands, simply states that Wife was awarded "*a 20% share of the business known as Choice Pool Care, L.L.C.*, and any other business owned by

---

[4] *See also Sexton v. Sexton*, No. E2023-00136-COA-R3-CV, 2024 WL 333954, at *11 (Tenn. Ct. App. Jan. 30, 2024) (explaining that in a divorce case "a court does not have jurisdiction over non-party LLCs or their assets, rather only over the parties' ownership interests in the LLCs themselves," but because the husband owned a 100% interest in the LLC, the trial court had the authority to award to the wife the husband's entire interest in the LLC).

[5] Throughout these proceedings, the parties and counsel used the terms ownership interest and membership interest interchangeably.

Husband now or in the future involving the sale of credit card machines and services, including the residual sales earned by Husband mentioned and detailed above." (emphasis added). As previously explained above, we interpret the trial court's order as classifying Husband's ownership interest in the LLC as a marital asset. The trial court then states that Wife is awarded a "20% share." However, the trial court did not specify how Wife was to be compensated for her share.[6]

More importantly, as Husband rightly notes on appeal, the trial court skipped the middle step in the process – valuation of the asset – prior to distribution. This Court has encountered similar situations before. In *Hill v. Hill*, No. M2011-02253-COA-R3-CV, 2012 WL 4762110, at *2 (Tenn. Ct. App. Oct. 5, 2012), a trial court classified real property as a marital asset and stated that the wife was "entitled to a share of the property," but it failed to value the asset. On appeal, we explained:

> Decisions concerning the division of marital property are necessarily fact-specific. *Edenfield v. Edenfield,* No. E2004-00929-COA-R3-CV, 2005 WL 2860289, at *7 (Tenn. Ct. App. Oct. 31, 2005). A trial court has a great deal of discretion in determining the manner in which it divides marital property, and an appellate court will generally defer to a trial court's decision unless that decision is inconsistent with the factors set out in Tenn. Code Ann. § 36-4-121(c) or the evidence preponderates against the decision. *Jolly v. Jolly,* 130 S.W.3d 783, 785-86 (Tenn. 2004); *see also Larsen-Ball v. Ball,* 301 S.W.3d 228, 234-35 (Tenn. 2010).
>
> The first step in the division of marital property is the classification of the parties' property as separate or marital. *Flannary v. Flannary,* 121 S.W.3d 647, 650 (Tenn. 2003). The trial court classified the residence Husband bought during the pendency of the divorce as marital property. Tennessee Code Annotated § 36-4-121(b)(1)(A) defines "marital property" to include "all real and personal property ... acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing ... and including any property to which a right was acquired up to the date of the final divorce hearing ...." The residence at issue falls squarely within the definition of marital property.
>
> The trial court is to "equitably divide, distribute or assign the marital property between the parties ... in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1). After the identification of the marital property, the trial court's next step is to place a reasonable value on each asset subject to division. *Fox v. Fox,* No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *7 (Tenn. Ct. App. Sept. 1, 2006). Valuation of marital assets is a question

---

[6] Husband later recognizes in his brief that the judgment "provides no guidance regarding the actual value of Appellee's purported twenty percent interest, how that interest should be calculated, [or] when payments should be made."

- 14 -

of fact. *Kinard v. Kinard,* 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). Each party has the burden of providing competent evidence concerning the value of disputed assets. *Id.* If there is conflicting evidence, the trial court "may assign a value that is within the range of values supported by the evidence." *Id.*

In this case, the trial court did not place a value on Husband's residence, but ordered that the property was "owned by both parties as tenants in common, and that [Wife] is entitled to a share of the property." This court has "repeatedly stressed the importance not only of classifying the parties' property but also placing a specific value on the property when trial courts turn their attention to the financial aspects of a divorce case." *Davidson v. Davidson,* No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *3 (Tenn. Ct. App. Oct. 31, 2005). In order to fulfill its duty of equitably dividing the marital estate, a trial court must assign a reasonable value to the assets in question. *Fox,* 2006 WL 2535407, at *7; *Edmisten v. Edmisten,* No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003). This view is consistent with the rule applied in most states that "the trial court must determine the value of all marital property before distributing it." 3 John Tingley & Nicholas B. Svalina, Marital Property Law § 44:1, at 44-2 (rev.2d ed. 2006).

*Id.* at *2-3. We concluded that "the trial court erred by failing to assign a value to this significant marital asset in order to facilitate the division of the assets." *Id.* at *3. In the absence of a value of the asset and a specification of the amount of the wife's interest, we could not evaluate the equity of the trial court's division of property. *Id.* Because the trial court "failed to value and distribute the parties' interests" in the asset, we vacated the trial court's judgment "with respect to the division of the marital assets and debts" and remanded for valuation and division of the parties' interests in the residence and consideration of the effect, if any, that decision should have on the apportionment of debt. *Id.* at *4; *see also Blevins v. Blevins*, No. M2002-02583-COA-R3-CV, 2003 WL 23094162, at *4 (Tenn. Ct. App. Dec. 30, 2003) (vacating and remanding for "valuation and equitable division" where the divorce decree did not apply a value to a certain fund); *Greer v. Greer*, No. W2000-02881-COA-R3-CV, 2002 WL 1751225, at *5 (Tenn. Ct. App. Feb. 22, 2002) ("[T]he trial court failed to place a value on all of the marital property. As a result we find it necessary to remand this action to the trial court for a determination of the values of the marital assets and an equitable [division] of them according to the factors enumerated in Tenn. Code Ann. § 36-4-121(c)(1-11).").

Thus, "Tennessee law is clear that '[t]rial courts must place a reasonable value on marital property that is subject to division.'" *Ewald v. Ewald*, No. M2024-00381-COA-R3-CV, 2026 WL 278088, at *10 (Tenn. Ct. App. Feb. 3, 2026) (quoting *Artry v. Artry*, No. W2020-00224-COA-R3-CV, 2022 WL 4372775, at *5 (Tenn. Ct. App. Sept. 22, 2022)). "The trial court has a general duty to assign values to the marital property even if

- 15 -

the many of the values are undisputed or the parties do not dispute which spouse should be awarded the property," but "this duty becomes even more important when the parties dispute the value of certain property." *Green v. Green*, No. W2019-01416-COA-R3-CV, 2021 WL 1343569, at *6 (Tenn. Ct. App. Apr. 12, 2021).

We recognize that, as is often the case, "some of the lack of clarity is attributable to the parties themselves, who have a duty to provide competent evidence of the property values." *Green*, 2021 WL 1343569, at *7. Husband admits in his brief that "there was little or no evidence of the value of the 'business'" presented at trial given his position that no asset existed. Wife contends that the trial court's "lack of formal valuation findings is attributable to [Husband's] own refusal to provide credible evidence or cooperate in good faith."[7] As the trial judge candidly admitted at the hearing on the motion to alter or amend, "I can't give you an amount because I don't know. I don't know. There was hardly any testimony concerning the business value. That's why I just said 20 percent." "However, the trial judge may resolve any disagreement amongst the parties by assigning property values within the acceptable range of values that the evidence supports. Indeed, the trial court should do so in order to aid our appellate review." *Id.* When a trial court fails to assign values to marital property, we typically do not "soldier on," but rather, "we typically vacate and remand for the trial court to make the proper findings and for the parties to present additional evidence as is necessary to aid the trial court in executing this duty." *Id.* Should the trial court need more evidence to properly value the asset, "it is well within its discretion to order the parties to present such evidence." *Id.* "Time does not stand still, and we are mindful of the fact that the 'value placed on marital property should, as near as possible[,] reflect the value of the property on the date that it is divided.'" *Barton*, 2020 WL 6580562, at *11 (quoting *Dobbs v. Dobbs*, No. M2011-01523-COA-R3-CV, 2012 WL 3201938, at *3 n.3 (Tenn. Ct. App. Aug. 7, 2012)). A final division has yet to occur in light of our disposition of this appeal and remand, and "we leave it to the trial court's discretion as to what proof is needed to reconsider its valuation of [Husband's interest in the LLC] as part of its reevaluation of the marital estate." *See id.*

We note that Husband goes to great lengths on appeal to argue that the "business" consists "solely of [his] individual sales efforts with no transferable assets, goodwill, or independent value." He insists that "the value of [his] LLC is zero" because it has no

---

[7] Wife also argues on appeal that Husband's "conduct throughout the proceedings squarely invokes the equitable doctrine of unclean hands." However, this issue was not raised in the trial court, so we will not consider it for the first time on appeal. *See Davis v. Davis*, No. W2025-00326-COA-R3-CV, 2026 WL 305007, at *4 (Tenn. Ct. App. Feb. 5, 2026) (explaining that the affirmative defense of unclean hands is generally deemed waived unless timely raised in an answer or responsive pleading); *see also In re Est. of Boote*, 265 S.W.3d 402, 418 (Tenn. Ct. App. 2007) ("Decisions regarding the proper application of the doctrine of unclean hands are heavily fact-dependent and are addressed to the considerable discretion of the trial court.").

assets, although, he says, "[t]he only possible arguable exception to this is the residual commission." In response, Wife characterizes Husband's passive recurring income stream as having "substantial ascertainable value," analogous to royalties, rental income, or investment yields. She also relies on this Court's decision in *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995), where the value of an insurance agent's business on the books had resulted from the agent's efforts and activities during the marriage, and therefore, the value of the contractual right to receive payment was properly considered as part of the marital estate. *See Cozart v. Cozart*, No. 02A01-9810-CV-00285, 1999 WL 669225, at *8 (Tenn. Ct. App. Aug. 27, 1999). Wife seeks either a lump sum payment for her share of the business's value or a set monthly award. We conclude that these arguments are best addressed in the first instance by the trial court when determining the valuation of the ownership interest in the LLC and fashioning an equitable distribution.

In summary, we affirm the trial court's classification of Husband's ownership interest in the LLC as marital property. We vacate the remainder of the ruling regarding the business and remand for the trial court to value the ownership interest prior to equitable division of this asset and the remainder of the marital estate.[8] We encourage the trial court to explain each factor that it relies upon to equitably divide the marital property, as required by Tennessee Code Annotated section 36-4-121(c), and take further proof if necessary. *See Green*, 2021 WL 1343569, at *7; *Barton*, 2020 WL 6580562, at *11. The court's rulings regarding child support and alimony are likewise vacated and remanded for reconsideration in light of the further proceedings that are necessary as to the division of the marital estate. All remaining issues are pretermitted.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the general sessions court is hereby affirmed in part, vacated in part, and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Travis Lynn Rasmussen, for which execution may issue if necessary.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE

---

[8] Husband has expressed concerns regarding the trial court's authority to order disposition of any property not owned by the parties, or even in existence, at the time of the divorce. Due to our ruling vacating the division of marital property, this Court expresses no opinion on this matter.